UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Martha P. Varela-Garcia,<br><br>                              Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner<br>of Social Security,<br><br>                              Defendant. | Case No.:  16cv665-WQH-BGS<br><br>**REPORT AND<br>RECOMMENDATION** |

## I.    PROCEDURAL BACKGROUND

On May 2, 2012, Martha P. Varela Garcia ("Plaintiff") filed a Title II application for a period of disability and disability insurance benefits, as well as a Title XVI application for supplemental security income.[1]  (ECF No. 8, Administrative Record "AR"

---

[1] Plaintiff initially filed applications for Social Security Disability Insurance benefits and Supplemental Security Income under Titles II and XVI of the Act, alleging the onset of disability on December 1, 2005.  (AR at 127-29.) After a hearing on June 11, 2009, Administrative Law Judge Larry Parker ("ALJ Parker") denied those initial applications.  (*Id.* at 107-23.) The Appeals Council then vacated ALJ Parker's initial denial, remanding the matter for further evaluation of Plaintiff's earnings history and of the opinions of several medical source opinions.  (*Id.* at 127.)  After a remand hearing, by written decision dated October 5, 2011, ALJ Parker again found Plaintiff not disabled and denied her Claim.  (*Id.* at 127-39.)  This Report and Recommendation only concerns Plaintiff's 2012 application for disability insurance benefits.  Plaintiff's prior application is only described for background purposes.

1

at 271-73, 274-81.)  In both applications, Plaintiff alleged disability beginning October 6, 2011.  (*Id.* at 271-73, 274-81.)  These claims were denied initially on November 16, 2012, and upon reconsideration on March 15, 2013.  (*Id.* at 201-05, 208-13.)  Thereafter, Plaintiff filed a written request for hearing on April 18, 2013.  (*Id.* at 215-16.)  After a hearing on April 30, 2014, Administrative Law Judge (ALJ) Jay E. Levine issued a decision denying the application on August 5, 2014.  (*Id.* at 41-68.)

On January 19, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision.  (*Id.* at 1-7.)  This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g), 1383(c).

Plaintiff filed her Motion for Summary Judgment on July 7, 2016.  (ECF No. 10.) In her Motion for Summary Judgment, Plaintiff argues that the ALJ erred in affording little weight to the opinions of her treating physicians, and that the ALJ erred in claiming to have granted great weight to the mental functional assessment of the state agency psychologist, but ultimately failed to credit those assessments.  (*Id.*)  Defendant filed her cross Motion for Summary Judgment on August 9, 2016.  (ECF No. 11-1.)  Plaintiff filed a reply on August 19, 2016.  (ECF No. 12.)

## II.   LEGAL STANDARD FOR DETERMINATION OF A DISABILITY

In order to qualify for disability benefits, an applicant must show that: (1) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  *Id.* The applicant has the burden to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

The Secretary of the Social Security Administration set forth a five-step sequential evaluation process for determining whether a person has established his or her eligibility

for disability benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. The five steps in the process are as follows:

1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520C, 416.920C.

3. Does the impairment "meet or equal" one or more of the specific impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof during steps one through four. *Id.* at 953. The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, then the claimant is disabled. If, however, the Commissioner proves that the claimant is able to perform other work that exists in significant numbers in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54. Here, the ALJ determined that

1   Plaintiff did not have any severe impairments, and did not proceed beyond step two.

2   **III.    MEDICAL RECORDS AND EVALUATIONS PRE-HEARING**

3          The Court has synthesized Plaintiff's medical records for the purpose of providing

4   context to its analysis of the issues.  This summary, however, does not purport to be

5   exhaustive of every detail contained in the administrative record.

6                    **A. Relevant Medical Evidence – Physical Impairments**

7                              **1. Dr. Roldan**

8          In March of 2011, Ms. Varela presented to internist Anselmo Roldan for

9   evaluation of backache and results of imaging studies.  (AR at 464-65.)  For her lower

10  back pain, she had received an epidural injection in February of 2011.  (*Id.* at 465.). She

11  also endorsed current depression, insomnia, irritability, and mood swings.  (*Id.*)  Dr.

12  Roldan noted that she displays evidence of recurrent fibromyositis in various parts of her

13  body, for which he prescribed Flexeril.  (*Id.*)

14         Two weeks later, on March 18, 2011, Plaintiff presented to Dr. Roldan with

15  complaints of left shoulder pain.  (*Id.* at 462.)  On April 8, 2011, she presented with pain

16  in her right hip, fainting attacks, weakness, and chronic pain.  (*Id.* at 460.)  Examination

17  showed her to be ill-appearing, depressed, sad, anxious, and nervous, with opacity in both

18  eyes, and musculoskeletal tenderness "all over."  (*Id.* at 460-61.)  Dr. Roldan diagnosed

19  Plaintiff with anxiety state, fibromatoses, shoulder symptoms, chronic pain syndrome,

20  cataracts, and spinal disc degeneration.  (*Id.* at 461.)

21         On May 31, 2011, Ms. Varela returned for follow-up on body aches, and was

22  reported to have an examination "unchanged from [her] previous visit."  (*Id.* at 446.)  Dr.

23  Roldan reviewed Plaintiff's x-rays and noted that the right ankle, foot, and hand were

24  normal.  (*Id.* at 441-43.)  Her ongoing diagnoses consisted of anxiety state, fibromatoses

25  (fibromyositis?), joint symptoms of the shoulder, chronic pain syndrome, cataracts,

26  arthritis, and disc degeneration.  (*Id.* at 403).  Dr. Roldan ordered multiple x-rays.  (*Id.* at

27  403.)  Plaintiff reported again to Dr. Roldan on June 10, 2011 (*id.* at 444), July 25, 2011

28  (*id.* at 378, 392, 435), August 22, 2011 (*id.* at 376, 433) and October 10, 2011 (*id.* at 375,

432), and for each visit he noted that her examination results were "unchanged."

On January 15, 2012 follow-up with Dr. Roldan, Ms. Varela reported pain in both arms, hands, and wrists that had worsened over the preceding several weeks. (*Id.* at 384.) Examination revealed a ganglion cyst in the left wrist, restricted ranges of wrist motion secondary to pain, positive Phalen's and Tinel's sign, and tenderness to palpation over both wrists. (*Id.* at 385.) Dr. Roldan stated in his notes that Plaintiff was "completely disabled" with "decline expected," and that she is "mildly dependent" on others to perform her daily activities. (*Id.*)

On April 3, 2012, Dr. Roldan noted the following: "no evidence of bony tenderness, joint effusion, enlargement or abnormal motion. No muscle fasciculations, atrophy, muscle weakness, asymmetry or reduce range of motion is noted." (*Id.* at 370) As for Plaintiff's status, Dr. Roldan stated that she was "completely disabled, decline expected, moderately dependent (needs person in home for some assistance) impaired in ADL, no improvement and stable." (*Id.* at 371, 388, 427.)

On April 18, 2012, Dr. Roldan wrote the following narrative statement regarding Plaintiff:

> My patient Martha Varela DOB: 1/17/1962 is considered permanently
> disabled due to multiple medical illness (sic) which include discogenic disc
> disease spinal columb(sic), chronic pain syndrome, fibromyalgia, chronic
> anxiety, osteoarthritis multiple sites and cataracts. Her conditions are
> chronic expecting to last many years. She is actively treated and evaluated.
> Moderate assistance is needed by relatives to assist her in ADL [Activities of
> Daily Living].

(*Id.* at 383.) On June 15, 2012, Plaintiff saw Dr. Roldan again. Notes from that visit state that "inspection of both the wrist joints reveals ganglion cyst left dorsum. Range of motion is restricted with secondary to pain. Movements are painful with all. Phalens sign is positive. Tinel's sign is positive. Tenderness to palpitation is noted over all over both." (*Id.* at 385.) He further stated that Plaintiff was "completely disabled, decline

expected." (*Id.* at 385, 425.) On August 7, 2012, Plaintiff saw Dr. Roldan for a referral for carpal tunnel surgery. (*Id.* at 668.) He noted during this visit that she had positive Phalen's and Tinel's signs and ganglion cysts on both wrists. (*Id.* at 669.) He further concluded that Plaintiff was "completely disabled." (*Id.* at 670.)

Notes from a visit on October 15, 2012 note that Plaintiff was able to "ambulate[] to the examination room without assistance" and that she was able to "sit comfortable on the examination table without difficulty or evidence of pain." (*Id.* at 422.) On March 8, 2013, Dr. Roldan noted that Plaintiff's musculoskeletal exam revealed "multiple trigger points all over." (*Id.* at 663.)

Plaintiff saw Dr. Roldan again for back pain on May 10, 2013. (*Id.* at 659.) Dr. Roldan noted that the pain, which Plaintiff described as aching and sharp was located in her lumbar spine and radiates to her buttock and right leg. (*Id.*) Dr. Roldan noted no scoliosis, asymmetry or abnormal curvature noted on inspection of the lumbar spine. (*Id.*) However, range of motion was restricted with flexion, lateral rotation to the left and right. (*Id.*) A straight leg raising tests was positive, as was a pelvic compression test. (*Id.*) A week later, on May 16, 2013, Plaintiff saw Dr. Roldan again, where he noted that she had "multiple triggered points tenderness c/w fibromyalgia's and depressive state." (*Id.* at 512, 655.) Dr. Roldan again reiterated his conclusion that Plaintiff would not be able to sustain work for eight hours a day, five days a week. (*Id.*)

In a letter dated August 16, 2013, Dr. Roldan affirmed his opinions that Ms. Varela "is permanently disabled" due to conditions including bilateral carpal tunnel syndrome, chronic anxiety, depressive state, discogenic disease, eye conditions affecting her vision, and chronic pain. (*Id.* at 516.) Also on August 16, 2013, Dr. Roldan completed an Impairment Questionnaire, in which he provided his assessment of Plaintiff's limitations based on his diagnoses of fibromyalgia, carpal tunnel syndrome, chronic pain syndrome, osteoarthritis, tenosynovitis, Major Depression, anxiety, glaucoma, and cataracts. (*Id.* at 519-23.) He noted that her primary symptoms consisted of visual disturbances and pain in her spine, hands, and wrist. (Id. at 520.) He further noted that he has been unable to

completely relieve those symptoms with medication without unacceptable side effects. (*Id.*)  Dr. Roldan estimated that, in a regular eight-hour workday, Plaintiff could sit, stand, or walk for less than one hour each; that she would have to get up and move around as often as needed; that she would need to elevate her legs up to six inches four to six times during an eight-hour day; that she could lift or carry any amount of weight no more than rarely; that her symptoms would frequently interfere with her attention and concentration; that she would need to take frequent unscheduled breaks throughout the workday; that her emotional state worsens her physical  her physical symptoms; and that she would likely miss more than three workdays a month due to her conditions.  (*Id.* at 521-23.)

### 2.  Dr. Borrero

On October 15, 2012, Ms. Varela presented to Dr. Marcos Borrero, a general practitioner in the same practice as Dr. Roldan, for medication refills and with complaints of vertigo.  (*Id.* at 421.)  Dr. Borrero noted that Plaintiff ambulated to the examination room without assistance and was able to sit comfortably on the examination table without difficulty or evidence of pain.  (*Id.* at 422.)  Dr. Borrerro prescribed Plaintiff Tramadol and referred her to pain management, psychiatry, and stress management counseling.  (*Id.* at 423.)

On September 9, 2013 follow-up with Dr. Borrero, Plaintiff presented with back pain and dizziness.  (*Id.* at 648-50.)  Examination showed tenderness in the cervical spine and costochondral joints and generalized myalgias and arthralgias affecting neck, shoulders, whole spine and lower extremities.  (*Id.* at 649-50.)

On May 28, 2014, Dr. Borrero completed a Rheumatoid Arthritis Impairment Questionnaire, in which he assessed the functional limitations stemming from Plaintiff's multi-site arthritis, disc degeneration, fibromatosis, myalgias, and myositis.  (*Id.* at 773-79).  He stated that her prognosis was "fair."  (*Id.* at 773.)  Her primary symptoms consist of generalized pain, easy fatigability, depression associated with low self-esteem, poor mental concentration, and no interest in life.  (*Id.* at 775).  He estimated that, in a regular,

eight-hour workday, Plaintiff could sit or stand/walk no more than one hour each, with the need to get up and move around every half hour; that she could lift or carry no more than 10 pounds occasionally and no weight frequently; that she has marked limitations in her abilities to perform gross and fine manipulations and to reach; that her symptoms constantly interfere with her attention and concentration; that she would be incapable of tolerating even a "low stress" work environment; and that she would likely miss less than one workday a month due to her impairments. (*Id.* at 774-78). He added that she is "very limited and unable to do any work at all," that her "conditions are progressively worse," and that she is "hopeless in getting back to work." (*Id.* at 779). Dr. Borrero endorsed essentially the same functional limitations in a separate questionnaire of the same date, with respect to Plaintiff's fibromyalgia. (*Id.* at 781-85.)

### 3.  Dr. Navarro – Treating Pain Management Specialist

On December 19, 2012, Plaintiff presented to pain management specialist Rosa Navarro for treatment of pain in her neck, arm, lower back and legs. (AR at 526.) Positive findings on examination consisted of tender facet joints and tenderness in the paracervical muscles bilaterally. (*Id.* at 527.) In treatment notes for this exam, Dr. Navarro noted an MRI of Plaintiff's lumbar spine from May 5, 2010, which showed degeneration at L5-S1 contacting the S1 nerve roots, as well as acquired central stenosis. (*Id.* at 528.) Dr. Navarro recommended that Plaintiff have a new MRI. (*Id.* at 528.) Dr. Navarro diagnosed Plaintiff with chronic pain syndrome, fibromyalgia, lumbosacral and thoracic radiculitis, and generalized anxiety disorder. (*Id.*)  She recommended epidural steroid injections for her radiculopathy and ketamine infusion for her chronic all-over body pain. (*Id.*)

On March 26, 2013 follow-up with Dr. Navarro, Plaintiff presented with lower back pain which she rated an eight out of ten in severity. (*Id.* at 525.) Dr. Navarro administered a caudal epidural steroid injection under fluoroscopy and ultrasound. (*Id.*)

Plaintiff returned to Dr. Navarro on April 14, 2014 with complaints of lower back pain that was radiating to her left leg down to her toes with muscular spasms. (*Id.* at

748.)  Dr. Navarro diagnosed lumbosacral spondylosis without myelopathy, lumbar and thoracic radiculitis, and chronic pain syndrome, and recommended two epidural injections.  (*Id.* at 750-51.)  Plaintiff received the injection on May 15, 2014.  (*Id.* at 752.)

### 4. Dr. Sabourin – State Agency Examining Orthopedist

On November 6, 2012, Thomas Sabourin, M.S., Board certified in orthopedic surgery, conducted a complete consultative evaluation of Plaintiff.  (*Id.* at 478-82.) Plaintiff's chief complaints were pain in her neck, shoulders, wrists, hands, upper back, lower back, chest, knees, ankles, and feet.  (*Id.* at 478.)  Dr. Sabourin noted that Plaintiff had significant gesturing and groaning throughout the entire examination.  (*Id.* at 480.) However, Plaintiff walked without a limp, was able to get on/off the examination table easily, and in and out of a chair without trouble.  (*Id.*)  Plaintiff noted tenderness from the occiput to iliac crest across the broad expanse of her back without differentiation.  (*Id.*) Although Dr. Sabourin noted that there was no redness, swelling, crepitus, effusion or deformities in any joints, there was generalized tenderness in Plaintiff's arm, and dorsal ganglion cysts on both wrists.  (*Id.*)  Tinel's and Phalen's tests resulted in pain.  (*Id.*) Based on this examination, Dr. Sabourin diagnosed Plaintiff with generalized pain syndrome, etiology undetermined; and ganglion cysts on the dorsum of both wrists.  (*Id.* at 481.)  Dr. Sabourin opined that Plaintiff had the following limitations: lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk six hours out of an eight hour workday; sit for six hours out of an eight-hour workday; climb, stoop, kneel, and crouch frequently; no manipulative limitations; and no need for assistive devices. (*Id.* at 482.)

### 5. Harvey Alpern, M.D. – Impartial Medical Expert

Harvey Alpern, M.D., an impartial medical expert, provided evidence in response to a medical interrogatory after the hearing before the ALJ.  (*Id.* at 763-65, 766-71.)  Dr. Alpern reported that no doctor had done tender point examination for fibromyalgia.  (*Id.* at 763.)  He stated that Plaintiff had the following impairments: body pain; wrist ganglion and carpal tunnel; cataract and glaucoma; episodes of urinary tract infection; and

psychiatric diagnoses.  (*Id.*)  Dr. Alpern opined that Plaintiff had the following limitations: lifting/carrying 10 pounds occasionally and frequently; sitting for two hours in an eight hour workday; standing for two hours in an eight hour workday; walking for six hours in an eight hour workday; occasionally reaching, handling, and pushing/pulling; frequently fingering and feeing; occasionally operating foot controls; occasionally climbing stairs and ramps, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders or scaffolds; and no exposure to unprotected heights and moving mechanical machinery.  (*Id.* at 768-69.)

### B.  Relevant Medical Evidence—Mental Impairments

#### 1.  Dr. Glassmire – Non-examining State Agency Psychologist

On May 27, 2014, at the behest of the state agency, psychologist David Glassmire assessed Plaintiff's residual mental function based on his review of the medical record.  (*Id.* at 754-56, 758-62.)  Dr. Glassmire opined that Plaintiff would have no limitations in her ability to understand, remember, or carry out simple instructions; mild limitations in her ability to make judgments on simple work-related decisions and to understand and remember complex instructions; and moderate limitations in her ability to carry our complex instructions and make judgments on complex work-related decisions.  (*Id.* at 754.)  He further concluded that Plaintiff had mild limitations in her ability to interact appropriately with supervisors and co-workers, and moderate limitations in her ability to interact appropriately with the public and respond appropriately to usual work situations and changes in a routine work setting.  (*Id.* at 755.)  Dr. Glassmire ultimately concluded that Plaintiff should be limited to non-complex routine tasks, no tasks requiring hyper-vigilance, and no interaction with the public.  (*Id.* at 762.)

### IV.   HEARING BEFORE THE ALJ

#### A.  Plaintiff's Testimony

Plaintiff is 52 years old.  (*Id.* at 44.)  She came to the United States [from Mexico] when she was 23 or 24.  (*Id.*)  She is separated from her husband and has been for about eighteen years.  (*Id.*)  They were married for ten years.  (*Id.* at 60.)  She has three grown

children, and she lives with one of her daughters.  (*Id.*)

Plaintiff had eye surgery on her right eye because she had a detached retina.  (*Id.*)
She also has cataracts and glaucoma.  (*Id.* at 46.)  She cannot see anything out of her right
eye, "just white."  (*Id.* at 47.)  Plaintiff started having difficulty reading three months ago.
(*Id.* at 53.)

Plaintiff testified that she has depression, fibromyalgia, hernias, vertigo and panic
attacks, which started "a lot of years ago."  (*Id.* at 48.)  These problems resulted from
losing eight children and the "bad life" with the father of her children, which included
abuse.  (*Id.*)

**B. Testimony of Estefania Villanueva, Plaintiff's Daughter**

Stephania Villanueva, Plaintiff's daughter, also testified at the hearing before the
ALJ.  (*Id.* at 49.)  Ms. Villanueva lives with Plaintiff and takes care of her finances,
medical care and anything she cannot do on her own.  (*Id.*)  Her older sister also lives
with them.  (*Id.*)  Ms. Villanueva testified that Plaintiff cannot work because of a
"combination of both physical and mental and psychological reasoning."  (*Id.*)  Ms.
Villanueva said that Plaintiff has depression and anxiety and cannot see from her right
eye.  (*Id.*)  Ms. Villanueva testified that her mother had a "problematic and unstable"
relationship with her father, which led her to be isolated "for a long time."  (*Id.* at 59.)
Plaintiff has lower back issues, with sciatica, so she cannot stand for long periods of time
because she gets tired and her back hurts.  (*Id.*)  Plaintiff also gets vertigo.  (*Id.*)

Ms. Villanueva testified that Plaintiff used to be an accounting clerk for a money
transfer company in California.  (*Id.*)  She began experiencing anxiety and depression and
"her reasoning was completely off" so she took some time off in 2003 or 2004 (*id.* at 51-
52) and never returned.  (*Id.* at 59.)  After she left her job at the money transfer company,
she started babysitting for families.  (*Id.* at 51.)  Plaintiff last worked in 2008.  (*Id.*)  Ms.
Villanueva started noticing that her mother had problems with vertigo and losing her
balance after Plaintiff's first eye surgery in April of 2010.  (*Id.* at 53-54.)

Plaintiff requires assistance around the house, specifically taking a shower and

sometimes getting dressed because she gets vertigo.  (*Id.* at 53.)  Ms. Villanueva tried to get in-home assistance in 2012, to help with cooking, cleaning, getting Plaintiff dressed, showered, and helping her get up and down the stairs, but Plaintiff did not have MediCal.  (*Id.* at 54-55.)  Plaintiff cannot bend over to put on her pants because she will get vertigo.  (*Id.* at 55.)  She needs help with cooking because she forgets things, like leaving the stove on.  (*Id.*)  She also drops things because she lacks physical strength, which has led to her burning herself.  (*Id.*)

Ms. Villanueva testified that Plaintiff gets drowsy and tired when she takes her medications and "can't really function."  (*Id.* at 56.)  Plaintiff's pain appears "random" in that she will be fine one moment and then she will not be able to move.  (*Id.* at 57.)  The pain is mostly in her lower back, and when she has been standing for a while.  (*Id.*)  Her hands become very stiff.  (*Id.*)  The doctors have said they want to perform surgery on her hands, but Plaintiff is scared, so she has not yet received the surgery.  (*Id.* at 57-58.)

**C. Vocational Expert Testimony**

Alan Cummings testified as the Vocational Expert ("VE").  (*Id.* at 60.)  He described Plaintiff's past work as babysitter, *Dictionary of Occupational Titles* ("*DOT*") code 301.677-010, medium, semi-skilled, SVP 3; and accounting clerk, *DOT* 216.482-010, sedentary, skilled, SVP 5.  (*Id.*)  The ALJ posed the following hypothetical to the VE:

> Assume a hypothetical individual of claimant's age, education, prior work experience.  Assume this person could lift or carry 20 pounds occasionally, ten pounds frequently, could stand or walk six hours out of an eight-hour day, could six (sic) hours out of an eight-hour day with normal breaks, no work on unprotected heights, no work on dangerous machinery, no ladders, occasional stairs and ramps, occasional stooping and bending, no job that requires depth perception, no intense sustained interaction with the pubic, coworkers or supervisors, social or incidental conversation is not precluded. Could such a hypothetical individual perform either of claimant's past work?

(*Id.* at 60-61.)

The VE testified that accounting clerk remains appropriate, but that babysitter would be precluded.  (*Id.* at 61.)  In his second hypothetical, the ALJ asked the VE to consider the same restrictions as the first hypothetical, but also limited to "simple, repetitive tasks."  (*Id.*)  In this case, the VE testified that all past work would be precluded, but that there would be alternative jobs: 1) light exertional level packager, *DOT* 559.687-074, light, unskilled, SVP 2, of which there are 434,000 in the national economy; 2) Assembler, *DOT* 731.687-034, which is a light, unskilled, SVP 2, with 218,000 such positions in the national economy; and 3) Cleaner, *DOT* 323.687-014, which is a light, unskilled, SVP 2, with 894,000 such positions in the national economy.  (*Id.*)  The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles*.  (*Id.*)

In his third hypothetical, the ALJ stated that the individual would have the same restrictions as in the second hypothetical, but would also "be off tasks at least 20 percent of the time due to psychological-based symptoms or pain, or dizziness."  (*Id.* at 61-62.)  The VE testified that such a hypothetical individual could perform no work.  (*Id.* at 62.)  Plaintiff's attorney asked the VE to assume a hypothetical individual "regardless of exertional level" who would miss more than three days a month of work.  (*Id.*)  The VE testified that such a hypothetical individual could perform no work.  (*Id.*)

Plaintiff's attorney asked the VE to assume a hypothetical individual who is unable to maintain concentration and attention for up to a third of the day.  (*Id.*)  The VE testified that would preclude the ability to maintain efforts for production and work pace, and such a hypothetical individual could perform no work.  (*Id.*)  Plaintiff's attorney asked the VE to assume a hypothetical individual who could lift 20 pounds occasionally, 10 pounds frequently, but only stand and walk for two hours in an eight-hour day, and was limited to simple tasks.  (*Id.* at 63.)  The VE testified that such a hypothetical individual could not perform Plaintiff's past work.  (*Id.*)  Plaintiff's attorney asked the VE to assume a hypothetical individual who was limited to standing and walking for two

hours in an eight-hour day, sitting for six hours in an eight-hour day, and was limited to occasional fingering and handling, fine manipulation.  (*Id.*)  The VE testified that such an individual could not do Plaintiff's past work.  (*Id.*)

## V.   ALJ'S OPINION

The Administrative Law Judge ("ALJ"), Jay E. Levine, issued his opinion on August 5, 2014.[2]  (*Id.* at 34.)  In reaching his decision, the ALJ applied the Commissioner's five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520 and described above.

### A. Step One

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2012.  (*Id.* at 25.)  He also found that Plaintiff has not engaged in substantial gainful activity since October 6, 2011, and therefore satisfies Step One.  (*Id.*)

### B. Step Two

At Step Two, the ALJ found that Plaintiff had the following severe impairments: arthritis; generalized pain syndrome; ganglion cysts in both wrists; cataracts; glaucoma; anxiety disorder; depressive disorder, not otherwise specified; and psychotic disorder, not otherwise specified.  (*Id.*)

---

[2] In this opinion, the ALJ noted that Plaintiff was found not to be disabled in a final decision by an Administrative Law Judge dated October 5, 2011, based on prior applications for a period of disability, disability insurance benefits, and supplemental security income.  (*Id.* at 22.)  In the prior decision, Plaintiff was found not disabled because she was found capable of performing past relevant work.  As a result, the ALJ noted that there is a rebuttable presumption of continuing nondisability under the Chavez Acquiescence Ruling (Social Security Acquiescence Ruling (AR) 97-4(9); and *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988)).  If the presumption is rebutted by a showing of changed circumstances, the ALJ is bound by the principles of *res judicata* to adopt certain findings made by the prior ALJ under the sequential evaluation process for determining disability, including Plaintiff's residual functional capacity, unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.  The ALJ found that, "with regard to the claimant's impairments and residual functional capacity, there is new and material evidence that shows changed circumstances."  (AR at 22.)  As a result, the ALJ did not adopt the findings of the prior ALJ decision regarding Plaintiff's residual functional capacity.  (*Id.*)

## C. Step Three

At Step Three, the ALJ found that the evidence did not support that Plaintiff has the severity of symptoms required either singly or in combination to meet or equal the conditions found under the medical listings, specifically 12.03, 12.04, and 12.06.  (*Id.*)  In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied, which require the mental impairment to result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  (*Id.*)  A marked limitation means more than moderate, but less than extreme.  (*Id.*)  Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of every four months, each lasting for at least two weeks.  (*Id.*)

The ALJ concluded that in activities of daily living, Plaintiff had no restrictions and that her allegations of limitations in this area were based on her physical impairments.  (*Id.*)  In social functioning, the ALJ found that Plaintiff had moderate difficulties as she alleged paranoia and feeling unsafe.  (*Id.*)  With regard to concentration, persistence and pace, the ALJ determined that Plaintiff had moderate difficulties as she alleged visual and auditory hallucinations.  (*Id.*)  The ALJ found that Plaintiff has experienced no episodes of decompensation of extended duration.  (*Id.* at 26.)  Therefore, because the ALJ found that Plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, he concluded that the "paragraph B" criteria were not satisfied.  (*Id.*)

The ALJ also considered whether the "paragraph C" criteria were satisfied, and determined that they were not.  (*Id.*)  The ALJ found no evidence of

repeated episodes of decompensation of extended duration, a residual

disease process that has resulted in such marginal adjustment that even a

minimal increase in mental demands or change in the environment would be

1   predicted to cause the individual to decompensate, or current history of one

2   or more years' inability to function outside a highly supportive living

3   arrangement with an indication of continued need for such an arrangement.

4   (*Id.*)  The ALJ also found no evidence of a complete inability to function independently

5   outside the area of Plaintiff's home.  (*Id.*)  Therefore, the ALJ concluded that the

6   evidence failed to establish the presence of the "paragraph C" criteria of Listing 12.03,

7   12.04, and 12.06.  (*Id.*)

8   **D. Step Four**

9   At Step Four, the ALJ found that Plaintiff had the residual functional capacity to:

10   perform a range of light work as defined in 20 CFR 404.1567(b) and

11   416.967(b).  Specifically, the claimant can lift/carry 20 pounds occasionally

12   and 10 pounds frequently; stand/walk for six hours out of an eight-hour

13   workday; sit for six hours out of an eight hour workday with normal breaks;

14   occasionally climb stairs and ramps; and occasionally stoop and bend.  The

15   claimant is precluded from work on unprotected heights or dangerous

16   machinery; climbing ladders; and jobs requiring depth perception.

17   Additionally, the claimant is limited to simple, repetitive tasks.  She is

18   precluded from intense, sustained interaction with the public, coworkers or

19   supervisors.

20   (*Id.*)  In making this finding, the ALJ considered all symptoms and the extent to which

21   those symptoms could reasonably be accepted as consistent with the objective medical

22   evidence and other evidence, as well as opinion evidence.  (*Id.*)

23   In considering Plaintiff's symptoms, the ALJ must follow a two-step process in

24   which it must first be determined whether there is an underlying medically determinable

25   physical or mental impairment(s) that could reasonably be expected to produce Plaintiff's

26   pain or other symptoms.  (*Id.* at 26-27.)  Second, the ALJ must evaluate the intensity,

27   persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which

28   they limit her functioning.  (*Id.* at 27.)  For this purpose, whenever statements about the

intensity, persistence, and limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.  (*Id.*)

The ALJ found that Plaintiff's allegations concerning the intensity, persistence and limiting effects of her symptoms were "less than fully credible."  (*Id.*)  Specifically, the ALJ stated that the allegations of severe symptoms were inconsistent with the objective medical evidence, which indicates an attempt by Plaintiff to exaggerate the severity of her symptoms.  (*Id.*)  For example, the ALJ noted that Plaintiff alleged that she needed assistance in her activities of daily living, but that consultative and other physical examinations were mostly normal, other than ganglion cysts on both wrists.  (*Id.*)  The ALJ noted that Plaintiff's "medical record is devoid of any x-rays, scans, or magnetic resonance imagings (MRI) that showed significant arthritis, degenerative disc disease, or spine problems, despite a patient-doctor relationship dating back to 2006."  (*Id.*)

The ALJ found that Plaintiff's daughter, Estefania Villanueva's allegations concerning the intensity, persistence and limiting effects of Plaintiff's symptoms were also "less than fully credible."  (*Id.*)  The ALJ noted that Plaintiff's daughter is not a medical professional, and, while a layperson can offer an opinion on a diagnosis, the severity of the claimant's symptoms, or the side effects of medications in relationship to the claimant's ability to work, such opinions are "far less persuasive on those same issues than are the opinions of medical professionals[.]"  (*Id.*)  He further noted that Ms. Villanueva's opinion was "not an unbiased one" because she had an "emotional motivation to support the claimant as well as a financial interest in seeing the claimant receive benefits."  (*Id.* at 28.)

The ALJ ultimately concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that Plaintiff's and Plaintiff's daughter's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment.  (*Id.*)

In determining Plaintiff's physical residual functional capacity, the ALJ gave some weight to the consultative examiner, Dr. Sabourin. (*Id.* at 30-31.) The ALJ gave some weight to the "visual limitations given in Exhibits B5F and B26F." (*Id.* at 31.) He gave little weight to the medical expert, Dr. Alpern, who opined that Plaintiff was able to sit for two hours, stand for two hours, but was able to walk for six hours in an eight hour workday because the ALJ found this opinion to be internally inconsistent. (*Id.*) The ALJ gave great weight to Dr. Glassmire, because "it reflected a thorough review of the mental health record." (*Id.*) The ALJ gave some weight to the consultative examiner, Dr. Valette, who opined that Plaintiff had no mental limitations. (*Id.*) The ALJ stated that he considered the findings from that examination, as well as the Plaintiff's allegations, and finds the limitations assessed in his residual functional capacity to be "appropriate." (*Id.*)

The ALJ gave little weight to statements which indicated Plaintiff was completely disabled, totally disabled, or permanently disabled because such a conclusion was "not supported by the evidence as a whole." (*Id.*) The ALJ noted that the medical record showed Plaintiff had generally normal findings during physical examinations, at one point stopping doctor visits "because of great improvement in paint." (*Id.*) He also noted that Plaintiff admitted to being able to drive. (*Id.*) The ALJ gave little weight to the opinions of Plaintiff's treating doctors, which indicated that Plaintiff was "limited to less than sedentary work, would miss work more than three times a month, or was unable to work" concluding they had no probative value because they were not supported by the objective medical evidence. (*Id.*) The ALJ gave little weight to the State agency medical consultants who found Plaintiff's physical and/or mental impairments nonsevere because they did not have an opportunity to examine or hear Plaintiff's testimony. (*Id.*)

### E. Step Five

Based on the medical evidence and testimony of the Vocational Expert, the ALJ found that Plaintiff has past relevant work of a babysitter and accounting clerk because she performed the work noted within fifteen years of the date of his decision, for a sufficient length of time to learn and provide average performance, and at a level of

1    substantial gainful activity.  (*Id.* at 32.)  However, in comparing Plaintiff's RFC with the

2    physical and mental demands of this past relevant work, the ALJ determined that she is

3    not able to perform this past relevant work.  (*Id.*)

4         The ALJ noted that Plaintiff was 49 years old (at the date of disability onset), has

5    at least a high school education, and is able to communicate in English.  (*Id.*)  The ALJ

6    noted that the transferability of job skills "is not material to the determination of

7    disability because using the Medical-Vocational Rules as a framework supports a finding

8    that the claimant is 'not disabled,' whether or not the claimant has transferable job skills.

9    (*Id.*)  Considering Plaintiff's age, education, work experience, and residual functional

10   capacity, the ALJ found that there are jobs that exist in significant numbers in the

11   national economy that Plaintiff can perform.  (*Id.*)

12        The ALJ found that Plaintiff's ability to perform all or substantially all of the

13   requirements of a light range of work would be impeded by additional limitations.  (*Id.* at

14   33.)  As a result, the ALJ asked the Vocational Expert whether jobs exist in the national

15   economy for an individual with Plaintiff's age, education, work experience, and residual

16   functional capacity.  (*Id.*)  The Vocational Expert testified that such an individual could

17   perform the representative occupations of: 1) Packager, *DOT* 559.687-074, which is a

18   light, unskilled (SVP 2) occupation, with 434,000 such positions in the national

19   economy; 2) Assembler, *DOT* 731.687-034, which is a light, unskilled (SVP 2)

20   occupation, with 218,000 such positions in the national economy; and 3) Cleaner, *DOT*

21   323.687-014, which is a light, unskilled (SVP 2) occupation, with 894,000 such positions

22   in the national economy.  (*Id.*)  The ALJ found that the Vocational Expert's testimony

23   was consistent with the information contained in the *Dictionary of Occupational Titles*.

24   (*Id.*)

25        Based on the testimony of the Vocational Expert, the ALJ concluded that, given

26   Plaintiff's age, education, work experience, and residual functional capacity, she is

27   capable of making a successful adjustment to other work that exists in significant

28   numbers in the national economy.  (*Id.*)  He, therefore, concluded that Plaintiff is "not

1  disabled" as defined in the Social Security Act.  (*Id.*)

2  **VI.   SCOPE OF REVIEW**

3        Section 205(g) of the Social Security Act allows unsuccessful applicants to seek

4  judicial review of a final agency decision.  42 U.S.C. § 405(g).  The scope of judicial

5  review is limited.  *Id.*  This Court has jurisdiction to enter a judgment affirming,

6  modifying, or reversing the Commissioner's decision.  *See id.*; 20 C.F.R. § 404.900(a)(5).

7  The matter may also be remanded to the Social Security Administration for further

8  proceedings.  *Id.*

9        The Commissioner's decision must be affirmed upon review if it is: (1) supported

10  by "substantial evidence" and (2) based on proper legal standards.  *Uklov v. Barnhart*,

11  420 F.3d 1002, 1004 (9th Cir. 2005).  If the Court, however, determines that the ALJ's

12  findings are based on legal error or are not supported by substantial evidence, the Court

13  may reject the findings and set aside the decision to deny benefits.  *Aukland v.*

14  *Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  Substantial evidence is more than a

15  scintilla but less than a preponderance.  *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir.

16  2003).  It is "relevant evidence that, considering the entire record, a reasonable person

17  might accept as adequate to support a conclusion."  *Id.*; s*ee also Howard ex rel. Wolff v.*

18  *Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record

19  despite the ALJ's failure to discuss every piece of evidence).  "Where evidence is

20  susceptible to more than one rational interpretation," the ALJ's conclusion must be

21  upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

22  **VII.   WHETHER THE ALJ ERRED IN NOT PROVIDING SPECIFIC AND**

23  **LEGITIMATE REASONS SUPPORTED BY SUBSTANTIAL EVIDENCE**

24  **WHEN HE AFFORDED LITTLE WEIGHT TO THE OPINIONS OF DRS.**

25  **ROLDAN AND BORRERO**

26        **A. Parties' Arguments**

27  Plaintiff argues that the ALJ rejected the more restrictive findings of treating

28

physicians Roldan and Borrero,[3] without providing specific and legitimate reasons for doing so.  (ECF No. 10 at 19.)  Defendant counters that the ALJ was justified in rejecting the extremely restrictive functional capacity opinions of Drs. Roldan and Borrero because they were "belied by objective imaging studies, musculoskeletal physical examinations, and by Plaintiff's own admitted activities."  (ECF No. 11-1 at 7.)

## B. Relevant Law

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).  To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.

In contrast, a contradicted opinion of a treating or examining medical professional may be rejected for "specific and legitimate" reasons that are supported by substantial evidence.  *Id.* at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).  However, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'"

---

[3] *See* section III(A)(1) for an overview of Dr. Roldan's treatment notes and medical source statement; *see* section III(A)(2) for an overview of Dr. Borrero's treatment notes and medical source statement.

*Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

### C. Discussion

The ALJ stated the following with respect to the treating physicians:

> The undersigned gives little weight to the opinions from the claimants treating doctors, which indicated the claimant was limited to less than sedentary work, would miss work more than three times a month, or was unable to work. (Exs. B16F, B31F, & B32F.) The undersigned finds these conclusions have no probative value. The statements were not supported by the objective medical evidence as discussed above. As an opinion on an issue reserved to the Commissioner, this statement is not entitled to controlling weight and is not given special significance pursuant to 20 CFR 404.1527(e) and 416.927(e); SSR 96-5.

(AR at 31.)

The ALJ gave "little weight" to the opinions from Plaintiff's treating doctors, which indicated that she was limited to less than sedentary work, would miss work more than three times a month, or was unable to work[4] because he noted that these statements were not supported by the objective medical evidence. (*Id.* at 31.) But the ALJ's discussion of the objective medical evidence did not provide "specific and legitimate" reasons for rejecting these opinions of Drs. Roldan and Borrero. Instead, the ALJ merely referred to his summary of the medical record—which included objective medical findings that both *supported* and *negated* Plaintiff's claims of disability. For example, the ALJ summarized medical findings from 2012 that "showed the claimant's musculoskeletal system was

---

[4] The ALJ also stated that the opinion that Plaintiff was unable to work was "an issue reserved to the Commission . . . [and] not entitled to controlling weight." (AR at 31.) Court agrees that, although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the ultimate determination of disability. *McLeod v. Astrue*, 640 F.3d 881, 884–85, 167 Soc. Sec. Rep. Serv. 43, Unempl. Ins. Rep. (CCH) P 14951C (9th Cir. 2011). However, an ALJ may not simply reject a treating physician's opinion on the ultimate issue of disability. *Ghanim v. Colvin*, 763 F.3d 1154, 1161, 207 Soc. Sec. Rep. Serv. 404, Unempl. Ins. Rep. (CCH) P 15285C (9th Cir. 2014). Even if the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide "specific and legitimate" reasons in order to reject the treating physician's opinion. *Id.* Therefore, the mere fact that Plaintiff's treating physician opined on an issue reserved for the commissioner is not a reason, in and of itself, to discount that opinion. The ALJ was required to provide specific and legitimate reasons for rejecting such an opinion, and failed to do so.

normal," (AR at 28 citing *id.* at 370), and also noted records from 2013 wherein Plaintiff

was diagnosed with mild degenerative disease of her cervical spine (*id.* at 29 citing *id.* at

578), and more recent progress notes from February 27, 2014 which indicated that

Plaintiff had "generalized pain in all 20 points on her back, shoulder, arms, and hands and

a diagnosis of unspecified myalgia and myositis; disc degeneration, not otherwise

specified; and acute bronchitis."  (*Id.*)

The ALJ failed to articulate which objective medical evidence undermined the

doctors' conclusions regarding Plaintiff's abilities, and what specifically led to his

decision to discount those conclusions.  Without guidance from the ALJ about his

interpretation of Plaintiff's medical records, in conjunction with specific reasons for

discounting the treating physician's opinions, this Court would be left to guess as to why

such opinions were discounted.  This is legal error.  The ALJ's opinion does not detail

what medical evidence he took into account in deciding to reject Plaintiff's treating

physicians' opinions regarding Plaintiff's abilities, because the ALJ did not explain

which medical evidence he relied on in determining that their opinions were unsupported.

*See also Ogin v. Colvin*, 608 F. App'x 519, 520 (9th Cir. 2015)(Finding that the ALJ

failed to provide specific and legitimate reasons for rejecting a treating physician's

opinions when she said that the physician's findings did not match the contemporary

findings found in the claimant's treating records, but failed to specify which findings in

which treating records she was relying on); *see also Jones v. Astrue*, 503 Fed. Appx. 516,

517 (9th Cir. 2012) citing *Lester*, 81 F.3d at 830 (An ALJ's unsupported assertion that

opinions contrary to the treating physicians are supported by the "great weight of

evidence" does not constitute specific and legitimate reasons for discrediting the treating

physicians' reports.)

The Court **RECOMMENDS** a finding that the ALJ failed to provide sufficiently

specific reasons for rejecting the opinions of Drs. Roldan and Borrero.[5]  Accordingly, the Court **RECOMMENDS** that this case be **REMANDED** to the Agency for further consideration.

**VIII.    WHETHER THE ALJ ERRED IN CLAIMING TO HAVE GRANTED GREAT WEIGHT TO THE MENTAL FUNCTIONAL ASSESSMENTS OF STATE AGENCY PSYCHOLOGIST GLASSMIRE BUT ULTIMATELY FAILING TO CREDIT THOSE SPECIFIC ASSESSMENTS**

In making his residual functional capacity determination, the ALJ explained that he gave the opinion of medical expert Dr. David Glassmire "great weight" because it "reflected a thorough review of the mental health record."  (AR at 31).  Dr. Glassmire filled out a Medical Source Statement of Ability to do Work-Related Activities (Mental).  (*Id.* at 754.)  In this nine-page form, Dr. Glassmire opined that Plaintiff would have no limitations in her ability to understand, remember, and carry out simple instructions, mild limitations in her ability to make judgments on simple work-related decision and to understand and remember complex instructions, and moderate limitations in her ability to carry out complex instructions or make judgments on complex work-related decision.  (*Id.*)  Dr. Glassmire also opined that Plaintiff had moderate limitations[6] in her abilities to interact appropriately with the public and respond appropriately to usual work situations and changes in a routine work setting.  (*Id.* at 755.)  Dr. Glassmire concluded that, from a mental health perspective, Plaintiff was limited to non-complex routine tasks, no tasks requiring hyper-vigilance, and no interaction with the public.  (*Id.* at 762.)

///

---

[5] The ALJ focused on the specific opinions of Drs. Roldan and Borrero that Plaintiff was limited to less than sedentary work, would miss work more than three times a month, or was unable to work.  (AR at 31.)  To the extent the doctors had additional opinions regarding Plaintiff's symptoms or limitations, the ALJ should likewise provide analysis regarding the weight he affords those opinions.

[6] The form defined "moderate limitations" as "more than a slight limitation in this area but the individual is still able to function satisfactorily."  (AR at 754.)

**A. Parties' Arguments**

Plaintiff argues that "the ALJ's residual functional capacity finding, even with its limitations regarding the complexity of tasks and the level of social interaction involved, conspicuously fails to incorporate Dr. Glassmire's specific assessments regarding Plaintiff's abilities to maintain concentration, persistence, and pace; to respond appropriately to usual work situations; and to respond appropriately to changes in a routine work setting." (ECF No. 10 at 22 citing AR at 754-55.) Plaintiff asserts that this constitutes the ALJ ignoring those moderate limitations noted by Dr. Glassmire. (ECF No. 10 at 22.) Plaintiff further argues that the fact that the ALJ failed to take these moderate limitations into consideration makes his conclusion that Plaintiff was able to perform even simple, repetitive work with limited interactions with others based on legal error. (*Id.* at 22-23.)

Defendant argues that Dr. Glassmire translated the degree of limitations into an RFC statement, which was ultimately adopted and reflected in the ALJ's RFC determination for Plaintiff. (ECF No. 11-1 at 9 citing AR at 26, 726.)

**B. Discussion**

Plaintiff appears to contend that the ALJ erred by not specifically mentioning Dr. Glassmire's conclusion of moderate limitations regarding Plaintiff's ability to maintain concentration, persistence, and pace; to respond appropriately to unusual work situations; and to respond appropriately to changes in a routine work setting. (ECF No. 10 at 22 citing AR at 754-55.) Plaintiff takes the position, without citing any authority, that the ALJ may ignore "mild" restrictions without explanation, but must include all "moderate" restrictions ascribed by an examining physician in the RFC or provide a detailed explanation for not including them.

Notably, in addition to allowing Dr. Glassmire to assign the degree by which Plaintiff was limited in certain areas, the questionnaire also asked Dr. Glassmire to state, from a mental health perspective, how Plaintiff would ultimately be limited in her ability

to work.  (*Id.* at 762.)  Dr. Glassmire limited Plaintiff to the following: "no complex routine tasks, no tasks requiring hyper-vigilance, no interaction with the public."  (*Id.*)  The ALJ noted those conclusions in his decision.  (*Id.* at 30 "He [Dr. Glassmire] opined the claimant was limited to non-complex routine tasks.  Additionally, she was precluded from tasks requiring hypervigilance, and interacting with the public.")  These limitations are further reflected in Plaintiff's RFC which stated that Plaintiff was limited to simple, repetitive tasks, and precluded from intense, sustained interaction with the public, coworkers, or supervisors.  (*Id.* at 26.)

The Court finds no inconsistency between Dr. Glassmire's conclusions regarding Plaintiff's limitations and the ultimate determination of Plaintiff's RFC by the ALJ.  Plaintiff has cited no authority to support the argument that the ALJ must discuss all moderate limitations stated by an examining physician, even if he fully adopts the ultimate conclusion of the examining physician.

Moreover, applying the harmless error analysis, the ALJ's failure to mention the moderate limitations ascribed by Dr. Glassmire was "inconsequential to the ultimate nondisability determination" in the context of the record as a whole.  *See  Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008);  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006);  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).  Although the ALJ failed to specifically mention the moderate limitations imposed by Dr. Glassmire, those opinions did not ascribe any limitations on Plaintiff beyond what Dr. Glassmire ultimately concluded: that Plaintiff would be limited to non-complex routine tasks, no tasks requiring hyper-vigilance, and no interaction with the public.  Because the ALJ included Dr. Glassmire's conclusions regarding Plaintiff's limitation in his RFC determination, any failure to specifically mention his opinions on Plaintiff's moderate limitations did not alter the ultimate disability determination.  As a result, any potential error was harmless.

The Court **RECOMMENDS** a finding that there was no legal error in this

instance, and even if there was legal error, such error was harmless.  As a result, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment should be **DENIED** on this basis.

## IX.   CONCLUSION

Having reviewed the matter, the undersigned Magistrate Judge **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part and that Commissioner's Cross-Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part.  The undersigned **RECOMMENDS** that this case be remanded to the Administrative Law Judge to further clarify his decision to afford little weight to the opinions of Plaintiff's treating physicians.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636(b)(1).

IT IS ORDERED that no later than **February 6, 2017**, any party to this action may file written objections with the Court and serve a copy to all parties. The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties no later than **February 20, 2017**.

Dated:  January 23, 2017

Hon. Bernard G. Skomal
United States Magistrate Judge